UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID WILSON McQUEEN,

    Movant,

                                                Case No. 1:17-CV-1149

v.                                       (Criminal Case No. 1:11:CR:335)

UNITED STATES OF AMERICA,          HON. GORDON J. QUIST

    Respondent.
_____/

**OPINION REGARDING McQUEEN'S § 2255 MOTION**

Pursuant to 28 U.S.C. § 2255, David Wilson McQueen moves to vacate, set aside, or correct his sentence. (ECF No. 1.) McQueen claims that he was denied effective assistance of counsel in the pre-trial, trial, sentencing, and appellate phases of his case. Because "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," § 2255(b), the Court will deny McQueen's motion in its entirety without a hearing.

**I. FACTUAL BACKGROUND**

The Sixth Circuit summarized the facts of this case as follows:

> In 2006, McQueen used a home equity loan acquired from the purchase of a rental home to personally invest in Maximum Return Trading (MRT). Jim Clements, the owner of MRT, represented to McQueen that Clements was earning returns of forty to fifty percent per month from currency trading. Clements told McQueen that he would receive a twenty-percent return, but it would eventually drop to ten percent. Soon after his initial investment with MRT, McQueen started accepting funds from others on behalf of his own company, Accelerated Income Group (AIG), to invest in MRT. In turn, he paid a five-percent return to those who had invested in AIG from the total ten percent he was receiving from MRT.

> For a short period of time, MRT fulfilled its obligations by making the promised returns to AIG. However, in mid–2007, MRT ceased making payments to AIG. Subsequently, McQueen stopped sending his investors' funds to MRT in mid–2007. Except for some nominal amount, MRT was insolvent. Despite the lack of returns from MRT, which were the only significant source of revenue for AIG at that time, McQueen managed to meet his payment obligations to preexisting AIG investors from the only source available to him: funds from new investors.
>
> McQueen also established three other investment funds, International Opportunity Consultants (IOC), Diversified Global Finance (DGF), and Diversified Liquid Asset Holdings (DLAH). With the help of his bookkeeper, Tricia Rice, McQueen comingled the funds from these newly created entities, paid himself a monthly salary ranging from $75,000 to $120,000, and compensated agents who helped him find new investors. McQueen personally received about $3.2 million in investor funds and spent an additional $3.1 million for business-related travel and other miscellaneous expenses. In addition, McQueen disbursed approximately $3.6 million in commissions for agents, who were paid between one and five percent for every month an investor's money remained with one of McQueen's entities.
>
> Following a tip from a financial institution in early 2008, IRS Agent Barbara Birdsong started investigating McQueen. In 2009, the IRS and the FBI executed a search warrant for McQueen's home, a home of one of McQueen's associates, and several business locations tied to McQueen. The search revealed severely depleted assets; the agencies recovered only $433,467 from McQueen's accounts.

*United States v. McQueen*, 636 F. App'x 652, 654 (6th Cir. 2016) (footnote omitted).

McQueen falsely represented to investors, either directly or through his agents, that (1) he would invest all of their money in some kind of investment; (2) the investment was safe or guaranteed; (3) he was very successful; and (4) investors could withdraw their money at any time. McQueen sent out monthly or quarterly account statements that communicated to investors that their investments were safe and growing. Although McQueen promised investors that they could liquidate their accounts at any time, most did not because they relied on the account statements. McQueen also funneled money through his associate, John Bertuca, a Berrien County bail bondsman. McQueen provided investment funds to Bertuca for "marketing" expenses, and directed Bertuca to pay McQueen's personal expenses with the funds.

2

## II. PROCEDURAL BACKGROUND

In late 2011, the Grand Jury for the Western District of Michigan returned fraud and money laundering charges against McQueen and Trent Francke, McQueen's business associate since 2007. One year later, the Grand Jury brought a superseding indictment that added Jason Juberg, Donald Juberg, and Penny Hodge as codefendants and an additional charge of securities fraud. Subsequent superseding indictments continued to add charges.

Trial commenced against McQueen on the Fourth Superseding Indictment on April 1, 2014. After a six-week trial with 40 government witnesses and 30 defense witnesses, McQueen was convicted on six counts of mail fraud, four counts of spending money laundering, one count of structuring, one count of concealment money laundering, and three counts of misdemeanor failure to file tax returns. The jury acquitted him of one count each of mail fraud, spending money laundering, and concealment money laundering.

On December 3, 2014, this Court sentenced McQueen to a below-guidelines sentence of 360 months' incarceration, more than $32 million in restitution, and three years' supervised release. McQueen appealed, but the Sixth Circuit affirmed his conviction and sentence in an opinion dated January 19, 2016.

## III. LEGAL STANDARDS

Pursuant to 28 U.S.C. § 2255(a), a prisoner in the custody of the United States may seek collateral relief from a sentence where "the sentence was imposed in violation of the Constitution or laws of the United States, or . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." A "[s]ection 2255 [motion] is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process." *Regalado v. United States*, 334

3

F.3d 520, 528 (6th Cir. 2003) (citing *United States v. Frady*, 456 U.S. 152, 167–68, 102 S. Ct. 1584, 1594 (1982)). Consequently, a habeas court will not readjudicate claims raised and rejected on direct review "absent countervailing equitable considerations." *Withrow v. Williams*, 507 U.S. 680, 720–21, 113 S. Ct. 1745, 1769 (1993); *see also DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) ("A § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances.").

Additionally, claims that a movant failed to raise on direct review are procedurally defaulted and "may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice', or that he is 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622, 118 S. Ct. 1604, 1611 (1998) (internal citations omitted). To show cause, a movant must demonstrate "that some objective factor external to the defense impeded counsel's efforts to comply with the . . . procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986). The movant also carries the burden of showing actual prejudice—"not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170, 102 S. Ct. at 1596 (emphasis in original). In the absence of cause and actual prejudice, the movant may present a new claim only if he can show actual innocence. "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623, 118 S. Ct. at 1611 (internal citations omitted). Importantly, "'actual innocence' means factual innocence, not mere legal insufficiency." *Id*.

Despite the barriers to raising new claims on collateral review, ineffective-assistance-of-counsel claims are generally not reviewable on direct appeal, but instead must be raised in a motion

under § 2255. *United States v. Quinlan*, 473 F.3d 273, 280 (6th Cir. 2007) (citing *Massaro v. United States*, 538 U.S. 500, 504, 123 S. Ct. 1690, 1693 (2003)). Ineffective-assistance-of-counsel claims are analyzed under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Under the first prong, the defendant must show that counsel's performance was "deficient." *Id.* at 687, 104 S. Ct. at 2064. That is, the defendant must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. The second prong requires the defendant to show that counsel's deficient performance prejudiced his defense—"that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*.

## IV. ANALYSIS

McQueen raises several issues related to alleged ineffective assistance of defense counsel. A court must grant a hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). McQueen claims ineffective assistance of counsel at every stage of the proceeding: plea bargaining, bond revocation hearing, trial, sentencing, and appeal. All of McQueen's arguments are based on facts that are unequivocally presented in the record or factual allegations that are inherently incredible. Thus, no hearing is required. *See Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018).

Plea Bargaining

Because McQueen has alleged that he was prejudiced by ineffective advice that led to the rejection of a plea offer, he "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light

of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 566 U.S. 156, 163–64, 132 S. Ct. 1376, 1385 (2012).

According to McQueen, he would have accepted any plea deal that did not require him to plead guilty to knowingly or intentionally defrauding victims. McQueen alleges that the terms of government's first plea deal in 2012 included (1) convictions based on "Sale of Unregistered Securities" and "Failure to File Income Taxes"; (2) a sentence capped at 180 months' imprisonment; and (3) government advocacy for downward departures based on McQueen's ability and willingness to cooperate. McQueen states that he did not accept the deal because defense counsel told him that it would be "impossible" to accept the government's plea offer without admitting that he knowingly and intentionally defrauded people. (ECF No. 1 at PageID.26; *see also* McQueen Aff., ECF No. 1-2 at PageID.161, ¶ 15.) But, McQueen argues, "Sale of Unregistered Securities" and "Failure to File Taxes" charges do not include an intent-to-defraud element. *See United States v. Spirk*, 503 F.3d 619, 621 (7th Cir. 2007) ("Section 5 of the Securities Act does not require proof of fraud: sale of unregistered securities is a crime no matter how candid the issuer."). Thus, in McQueen's view, defense counsel's misinformation led him to reject a plea offer that would have capped his sentence at half the term of imprisonment to which he was sentenced following trial.

The government has no record of the alleged 2012 plea deal, but submitted evidence of an April 2013 plea offer that would have required McQueen to "plead guilty to crimes that have a total statutory cap of fifteen years" without specifying the crimes to which McQueen would plead guilty. (ECF No. 22-1 at PageID.300.) And a combination of charges of sale of unregistered

6

securities and failure to file tax returns would not have resulted in a 15-year maximum sentence. The government also states that it would not have signed a 15-year cap plea agreement without a successful proffer, which never happened and was not even attempted until November 2013, six months after the plea offer expired. (ECF No. 22 at PageID.268.)

Ordinarily: "Where there is a factual dispute, the *habeas* court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Turner v. United States*, 183 F.3d 474, 477 (6th Cir. 1999). However, a district court may "forego a hearing where the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Martin*, 889 F.3d at 832. McQueen's allegations suffer from all three of the above infirmities.

To begin, McQueen's factual allegations are contradicted by the record and inherently incredible. McQueen claims that he received the government's first plea offer in 2012 and that the plea offer included convictions based on "Sale of Unregistered Securities" and "Failure to File Income Taxes" and a 15-year cap. (ECF No. 1 at PageID.26.) But the operative indictment in 2012 was the first indictment, which only included charges for mail fraud, money laundering, and structuring. (Indictment, R.1 at PageID.15–21.) Even if McQueen is referring to the April 2013 plea offer that included a 15-year cap, the operative indictment was the Second Superseding Indictment, which added charges for sale of unregistered securities but did not include charges for failure to file taxes.[1] (R.71 at PageID.305–337.) Moreover, McQueen cites Exhibit B (ECF No. 1-1 at PageID.141) as proof that defense counsel told him that he would have to plead guilty to fraud charges to accept the government's 15-year plea offer. But Exhibit B was an email from

---

[1] While it may be conceivable that the government discussed with the defense a plea offer that included charges that had not yet been brought, it is inherently incredible that the government would discuss the prospect of charges for failure to file tax returns and not include those counts in the next superseding indictment. It was not until the *Fourth* Superseding Indictment that the government added charges for failure to file tax returns. (R.176 at PageID.983–988.)

7

defense counsel dated January 24, 2014, and McQueen states that the favorable plea deal that he rejected was offered in 2012. So, McQueen's allegations are contradicted by his own exhibits.

Further, McQueen's allegation that he could have pled guilty to sale of unregistered securities and failure to file tax returns without admitting intent is conclusory. The law is unsettled on whether there is an intent element for the charge of sale of unregistered securities. *Compare Spirk*, 503 F.3d at 621 ("Section 5 of the Securities Act does not require proof of fraud: sale of unregistered securities is a crime no matter how candid the issuer."), *with United States v. Lindo*, 18 F.3d 353, 357 (6th Cir. 1994) (affirming defendant's conviction for unlawful sale of unregistered securities after finding that there was sufficient evidence to support the intent element). At this stage of the proceedings, McQueen has the burden to show that defense counsel's alleged errors were clear. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. But even if McQueen could show that there was an offer to plead guilty to sale of unregistered securities and that defense counsel advised him that he would have to admit intent, McQueen cannot carry the burden of showing that defense counsel's advice was clearly erroneous.

While it may appear at first blush that this case presents a factual dispute sufficient to warrant an evidentiary hearing, a hearing is not required here. Because McQueen's factual allegations are contradicted by the record, inherently incredible, and conclusory, the Court will forgo a hearing and find that defense counsel was not ineffective during the plea-bargaining process.

<u>Bond Revocation Hearing</u>

McQueen alleges that defense counsel was ineffective for failing to object when "the government fabricated a storyline that Movant engaged in a conversation with tenants of a house (the Sharkeys) in 2011 suggesting a willingness to attempt to defraud the lender and mortgage

8

holder on the house." (ECF No. 1 at PageID.106.) However, it is not clear to what defense counsel could have objected. The government provided evidence that McQueen had engaged in the conduct as alleged. (*See* Mot. to Revoke Bond, R.98 at PageID.402-13.)[2] There is no deficient performance in failing to raise a meritless objection. *Lafler*, 566 U.S. at 167, 132 S. Ct. at 1386. Moreover, other than McQueen's belief that he would have been treated more favorably by the Court without this information, McQueen has not explained how this alleged deficiency prejudiced his convictions.

Trial

McQueen alleges several instances of ineffective assistance of defense counsel during the trial: (1) failure to interview and subpoena witnesses to negate McQueen's mens rea; (2) failure to obtain "use immunity" or a continuance to secure the testimony of Jim Clements; (3) failure to enter evidence of McQueen's timeline of events and state of mind; (4) failure to show that McQueen was actually innocent of certain counts; and (5) failure to object to prosecution's case and the Court's interjections. However, the facts on the record refute McQueen's allegations, and McQueen has not carried his burden to overcome the strong presumption that defense counsel was competent. *United States v. Cronic*, 466 U.S. 648, 658, 104 S. Ct. 2039, 2046 (1984).

First, McQueen argues that defense counsel should have called South Carolina FBI agents to give their opinion of McQueen; Ted Steinmetz to testify that MRT misrepresented its earnings to McQueen; and Dick Mann to corroborate McQueen's assertion that he relied on Bob Rutger's advice. However, none of these witnesses would have made a difference in McQueen's case. The testimony of the above proposed witnesses would have been cumulative of the evidence presented at trial, and in any case, McQueen has not shown that the testimony would be exculpatory. A

---

[2] When referring to docket entries from the underlying criminal case, Case No. 1:11-CR-335, the Court will cite the docket entries as "R."

videotape and transcript of the interaction between McQueen and the South Carolina FBI agents was entered into evidence, and although McQueen states that "material conversations between McQueen, Francke, Attorney Lindauer, and S.C. FBI Agents occurred Off-record [sic]," (ECF No. 1-2 at PageID.160), McQueen has not identified any exculpatory statements from those conversations. Through multiple witnesses, including his own testimony, McQueen presented evidence that he was defrauded by MRT and that he relied on legal advice in acting as he did, so the testimony of Ted Steinmetz and Dick Mann was unnecessary. Consequently, McQueen fails to "show that, had [the witnesses] testified, the result of his trial would have been different with a probability sufficient to undermine the confidence in the outcome." *Davis v. Booker*, 589 F.3d 302, 307 (6th Cir. 2009) (internal quotation marks omitted).

Next, McQueen extensively argues that the testimony of Jim Clement, the owner of MRT, was essential to his defense, and failure to obtain "use immunity" or a continuance to secure his potentially self-incriminating testimony rose to the level of a due process violation. However, McQueen has not been able to fully articulate how Clement's testimony would have been exculpatory. Moreover, defense counsel confirmed with McQueen on the record that there were no further witnesses or exhibits that he wanted to present before the defense rested, emphasizing that once the defense rested "neither [defense counsel or McQueen] w[ould] have the right to complain that [they] were not given the chance to present something." (ECF No. 12-3 at PageID.240.) Thus, defense counsel acted reasonably in choosing not to pursue use immunity or a continuance after Clements invoked his Fifth Amendment right to avoid self-incrimination and McQueen confirmed that the testimony was not necessary.

In the same vein, McQueen's allegation that defense counsel was deficient for not moving to admit several pieces of evidence—a handwritten timeline of events; reports from Florida FBI

agents; MRT account statements and a 2007 recording of an MRT investor "success meeting"; the South Carolina FBI report; a recording of McQueen's conversation with accountant Casey Young; and QuickBooks records—is specious. First, much of the aforementioned evidence would be inadmissible hearsay. Second, none of the above, singly or altogether, exculpates McQueen from his false representations to investors. Third, as noted above, McQueen stated on the record that there was no further evidence that he wished to have presented to the jury to support his defense. Therefore, defense counsel's actions in not moving to admit additional exhibits "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

Next, McQueen challenges his convictions on Count 11 – money laundering through Harley Davidson; Count 16 – structuring; and Count 32 – money laundering through Bertuca. However, McQueen's arguments are essentially challenging the sufficiency of the evidence supporting those convictions, which McQueen argued on appeal, but the Sixth Circuit affirmed his convictions. *See McQueen*, 363 F. App'x at 659–63. McQueen cannot use his § 2255 motion to relitigate the sufficiency of the evidence supporting his convictions. *Withrow*, 507 U.S. at 720–21, 113 S. Ct. at 1769. Furthermore, to establish prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 792 (2011). McQueen has made no such showing here.

Finally, McQueen claims the defense counsel was deficient for failing to object to the prosecutor's case and the Court's interjections. However, failure to raise a meritless objection cannot constitute deficient performance, *Lafler*, 566 U.S. at 167, 132 S. Ct. at 1386, and the Sixth Circuit has stated that counsel's failure to object is rarely deficient performance, *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006).

McQueen believes that defense counsel should have objected to: (1) the inclusion of testimony from attorneys Ron Geffner, Jeff Gery, and Kim Baber; (2) the government's pie chart exhibit; (3) leading questions by the government; (4) the government's characterization of testimony in its opening statement and closing argument; (5) the Court asking clarifying questions of witnesses; and (6) the Court hurrying defense counsel. For any of these supposed failures to object to constitute deficient performance, McQueen must show that a single failure to object "essentially default[ed] the case to the state" or that "defense counsel . . . so consistently fail[ed] to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice." *Lundgren*, 440 F.3d at 774. McQueen is far from showing that any single failure to object defaulted the case because several of the suggested objections lacked merit,[3] and defense counsel limited his objections in a "tactical manner." *See id*. Moreover, McQueen has not shown that he was prejudiced by defense counsel's judicious use of objections because none of the non-objections would have changed the outcome of the proceeding.

Sentencing

According to McQueen, defense counsel (1) failed to object to a miscalculation of the guidelines and certain enhancements in the presentence investigation report (PSR); (2) participated in improper ex parte communications with the Court prior to sentencing; and (3) failed to correct the Court when it relied on false and unreliable information during the sentencing process. Because McQueen did not raise these challenges to his sentence on appeal, he can only prevail if

---

[3] An objection to the relevance of the testimony of Geffner, Gery, and Baber would have failed because the testimony rebutted McQueen's assistance-of-counsel defense. Objecting to the pie chart exhibit as misleading would have failed because IRS agents testified to what the figures in the chart entailed. The government had evidence to support its characterizations in its opening statement and closing argument; McQueen simply considered the evidence differently. The Sixth Circuit ruled on appeal that the Court properly managed the presentation of evidence, urging both the government and the defense to present their case efficiently. *McQueen*, 636 F. App'x at 667. Likewise, the Court can properly ask clarifying questions.

12

he can show that defense counsel's performance was deficient and that he suffered prejudice as a result. *See Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996) (holding that non-constitutional errors, such as mistakes in the application of sentencing guidelines, are ordinarily not cognizable on collateral review, and, as such, § 2255 relief is only available subject to *Strickland* standards).

McQueen's first claims that defense counsel failed to object to a miscalculation of the guidelines and to certain enhancements in the PSR. The majority of the objections that McQueen wished defense counsel to make would have been meritless, and counsel cannot be deficient for failing to raise a meritless objection. *Lafler*, 566 U.S. at 167, 132 S. Ct. at 1386. McQueen disagrees with the enhancement for vulnerable victims, but as the Court explained, McQueen targeted elderly, unsophisticated victims, (Sent. Tr., R.468 at PageID.9767), by selling his securities through the Jubergs, who sold Medicare supplemental insurance. McQueen disputes the applicability of the enhancements for more than 250 victims and for endangering the financial security of 100 or more victims, but as the Court stated, even if defense counsel had not withdrawn his objections to those two enhancements, "the letters [the Court] looked at would certainly have garnered" the enhancements. (*Id.*) McQueen argues that the loss calculation should not have been calculated based on the entire fraud, but rather only on the loss related to his counts of conviction. However, the guidelines are clear that specific offense characteristics and adjustments are based on all relevant conduct. U.S.S.G. § 1B1.3(a)(1). McQueen also challenges the applicability of the enhancement for his role in the offense, as the leader or organizer of a criminal activity involving five or more participants. Though McQueen argues that the majority of the people who sold his securities were independent contractors, that does not change the fact that he directed their activities and created the entities that perpetuated the fraud. Thus, defense counsel's objections to any of the above enhancements would have been frivolous.

While McQueen is correct that there is one mistake in the calculation of his guidelines, a modification would not qualify him for any relief. Under the version of the guidelines in effect when McQueen was sentenced, McQueen received a 6-level increase for more than 250 victims, § 2B1.1(b)(2)(C) (2014), and a 4-level increase for endangering the financial security of 100 or more victims, § 2B1.1(b)(16)(B) (2014), but the cumulative adjustment for those two enhancements should have been capped at eight levels. § 2B1.1(b)(16)(C) (2014). Consequently, McQueen's offense level should have been 43, rather than 45. (R.468 at PageID.9767-68.) But McQueen cannot show prejudice; the guideline range for an offense level 43 or higher is life imprisonment. Whether McQueen's offense level was 43 or 45, his guideline range was still life, and he received a below-guidelines sentence of 360 months' imprisonment.

Next, McQueen argues that defense counsel engaged in an improper ex parte conversation with the Court prior to sentencing. To offer context, the Court stated on the record:

> I think defense - - or the government counsel should know that before coming out here I had a brief ex parte conversation with [defense counsel] and simply asked him whether he was going to pursue the points given for endangering financial security and over 250 victims because I was having my law clerks go through there and count those things and look at them, and he said that he is withdrawing his objections. So that matter is resolved.

(*Id*. at PageID.9749-50.) There was nothing improper about the Court's conversation with defense counsel. As a practical matter, the Court wished to know if it should continue to expend resources to review victim statements. And, on the record, the Court informed all of the parties of the content of the conversation. To the extent McQueen is challenging the withdrawal of objections to the enhancements for over 250 victims and for endangering the financial security of 100 or more victims, as explained above, those objections would have been meritless.

Finally, McQueen claims that defense counsel failed to correct the Court when it relied on allegedly false or misleading information at sentencing. However, any of the information on which

14

the Court relied was supported by facts adduced at trial or in preliminary hearings. The Court simply did not credit McQueen's version of events that the jury had already rejected. Therefore, defense counsel was not ineffective for failing to object, and McQueen suffered no prejudice.

### Appeal

Defense counsel who represented McQueen at trial, attorney Scott Graham, also represented McQueen on appeal. McQueen argues that Mr. Graham was ineffective and that Mr. Graham should have recused himself from post-conviction proceedings "so competent counsel could have been appointed," (ECF No. 1 at PageID.126). But McQueen's arguments fail for two key reasons: (1) McQueen is unable to show that Mr. Graham was ineffective on appeal, and (2) McQueen specifically requested to have Mr. Graham handle his appeal, (R.468 at PageID.9791).

To succeed on a claim of ineffective assistance of appellate counsel, McQueen must satisfy the *Strickland* standard. In other words, McQueen must show that appellate counsel's performance was objectively deficient and that "there is a reasonable probability that, but for his counsel's failings, [McQueen] would have prevailed on his appeal." *Goff v. Bagley*, 601 F.3d 445, 462–63 (6th Cir. 2010) (internal quotation marks and alterations omitted). Specifically, "[c]ounsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004). McQueen has raised no issue in his habeas petition that would have changed the result of his appeal, and it would be odd indeed to say that Mr. Graham should have recused himself from handling McQueen's appeal after McQueen, without prompting, requested Mr. Graham's assistance on appeal.

15

## V. CERTIFICATE OF APPEALABILITY

Having concluded that McQueen is not entitled to relief, the Court must next determine whether a certificate of appealability should issue under 28 U.S.C. § 2253(c)(2). A certificate should issue if the movant has demonstrated a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit has disapproved issuance of blanket denials of certificates of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595 (2000); *Murphy*, 263 F.3d at 467.

Under *Slack*, 529 U.S. at 484, 120 S. Ct. at 1604, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." The Court concludes that, for the reasons stated above, reasonable jurists could not find this Court's conclusion that McQueen is not entitled to relief debatable or wrong. Therefore, the Court will deny McQueen a certificate of appealability.

## VI. CONCLUSION

For the foregoing reasons, the Court will dismiss McQueen's § 2255 Complaint and deny McQueen a certificate of appealability. A separate order will enter.


Dated: November 19, 2019                            /s/ Gordon J. Quist
                                                    GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE